Filed 9/16/21  P. v. Lindstrom CA3

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C088699 |
| Plaintiff and Respondent, | (Super. Ct. No. 16FE022125) |
| v. | |
| MICHAEL KAJ LINDSTROM, | |
| Defendant and Appellant. | |

Defendant Michael Kaj Lindstrom's dog attacked and severely injured his neighbor.  A court afterward, following a bench trial, convicted him of knowingly possessing a "mischievous animal" that caused serious bodily injury to another.  The court sentenced defendant to 364 days in jail, suspended execution of sentence, and placed defendant on formal probation for five years.

On appeal, defendant raises five issues.  He contends (1) the court wrongly denied his request to relieve his retained attorney, (2) his counsel was ineffective because he

1

failed to request pretrial mental health diversion, (3) his counsel was ineffective because he advocated against, rather than for, him at sentencing, (4) the court wrongly imposed a probation term that would extend beyond the five-year term of probation, and (5) he should be discharged from probation because a recent change in the law reduced felony probation to two years.

We agree with defendant's first contention and find his remaining four arguments moot. Defendant sought to discharge his attorney after his conviction and before sentencing, stating that his attorney would not meet with him and did not provide adequate representation. But the trial court denied the request. Applying the standard applicable for indigent defendants who seek to replace their appointed counsel, the court denied defendant's request because it found he had failed to show that his attorney was providing inadequate representation or that he and his attorney were embroiled in irreconcilable conflict. But because defendant sought to replace his *retained* counsel, not *appointed* counsel, the court should have evaluated defendant's request under a different standard. In particular, the court needed to grant his request unless it concluded that granting it would significantly prejudice defendant or cause unreasonable delay in the processes of justice. (*People v. Ortiz* (1990) 51 Cal.3d 975, 983, 987 (*Ortiz*).) Because we find the trial court wrongly denied defendant's request, we reverse and remand for further proceedings.

BACKGROUND

I

*Factual Background*

Defendant formerly owned a pit bull named Red. According to his neighbor, Julian Salazar, Red "was outside running loose most of the days," generally without supervision. Salazar often went outside "to make sure he wouldn't hurt the kids" in the neighborhood and, on most days, when Salazar told Red to "go home," Red complied.

2

But on one date in late 2016, he did not. After hearing Red barking outside in early November of 2016, Salazar became concerned "[h]e might hurt one of the kids" and so came outside and told Red to go home. When Red failed to listen, Salazar moved closer to Red and again told him to go home. But rather than return home, Red pounced on Salazar and knocked him to the ground. Salazar, who was nearly 90 years old at the time, yelled for help as Red bit his neck, his face, and the rest of his body. Eventually, Salazar's stepson, who had been sleeping, awoke and came outside. He initially asked defendant to help, but, when defendant expressed concern at being bit himself and refused, he approached the dog and pulled him off of Salazar.

Salazar was afterward brought to the hospital, where he remained for the next two weeks. He "had bites and scratches all over" requiring "something like 75 stitches," had his lower lip torn down to his chin, and had "a big gash" along his neck and a "big hole" in his check. He also lost half of an ear, part of a finger, and a three-inch-long flap of skin from his forehead, though the piece of skin was later reattached. Some of Salazar's wounds eventually healed, but others did not. At the time of trial, for example, Salazar could no longer fully close his mouth and one of his hands and could no longer feel his lower lip and the ends of his fingers. His hearing and his ability to eat also had deteriorated as a result of the attack.

Apart from attacking Salazar, Red had also previously attacked other people and dogs. In 2014, a man noticed Red off-leash across the street while walking a friend's dog. Shortly after, Red charged and bit the man and the dog. In 2015, defendant received care from a paramedic after Red attacked him, and a few months later, also in 2015, defendant was hospitalized after Red attacked him again. Finally, in 2016, a woman noticed Red off-leash across the street while walking her dog. Red afterward charged and attempted to attack her dog, but the owner successfully shielded her dog from Red.

II

*Procedural Background*

After the attack on Salazar, the Sacramento County District Attorney charged defendant with two felony counts. In count one, the prosecution alleged that defendant knowingly possessed a dog trained to fight, attack, or kill, and, because of defendant's negligence, the dog caused substantial physical injury to Salazar. (Pen. Code, § 399.5, subd. (a).)[1] In count two, the prosecution alleged that defendant knowingly possessed a "mischievous" dog, and, because of defendant's negligence, the dog caused serious bodily injury to Salazar. (§ 399, subd. (b).)

On September 7, 2018, following a bench trial, the trial court found defendant not guilty of count one and guilty of count two. Counsel and the court afterward discussed next steps, including the possibility of pursuing mental health court and referring the matter to probation. In the end, at the request of both the prosecutor and defense counsel, the court referred the matter to probation and instructed defendant to cooperate with his counsel to complete the necessary forms for mental health court. The court then scheduled another hearing for November 2, 2018.

At the November 2, 2018 hearing, defendant's counsel requested additional time to pursue mental health court. To be eligible for mental health court, defense counsel explained, defendant needed to be "actively, currently treating with a psychiatrist with a diagnosis, a medical treatment plan, and that sort of thing." But because defendant was not currently being treated, defense counsel asked for a continuance until November 7, 2018, to allow defendant time to see a psychiatrist and begin "some kind of treatment plan." The court agreed to the requested continuance but expressed an interest in moving

---

[1]     Undesignated statutory references are to the Penal Code.

4

things along.  It noted that there had already "been such a delay" and "Lindstrom had made zero efforts."

The court later rescheduled the November 7 hearing for November 6, 2018 "to accommodate the Court," but, when defendant failed to appear on the rescheduled date, the court scheduled another hearing for November 30, 2018.  At the November 30, 2018 hearing, defendant's counsel informed the court that defendant saw a doctor, was evaluated and received a diagnosis and a treatment plan, but he declined to participate in the treatment plan.  A family friend of defendant supplied further information.  She explained that defendant refused treatment because the doctor "wanted to give him these injections and there was no . . . choice of other medications at all."  She added that she would "make sure that . . . he gets a different doctor."

After the court expressed disappointment in defendant's failure to obtain a treatment plan, defendant asked for an opportunity to speak.  He then asked if he could "fire [his] attorney and get a new attorney."  He explained that he "ha[d] not had one single opportunity to meet with [his] attorney and discuss the case with him, not one time, and [he] ha[d] requested it over and over and over."  He added that he did not "think [he was being] well represented."

Based on defendant's comments, the court found it necessary to hold a hearing pursuant to *People v. Marsden* (1970) 2 Cal.3d 118, 123.  At the hearing, defendant asserted that his counsel had failed to meet with him to discuss his case and to develop a strategy.  He further asserted that he wanted to call various witnesses about his character and the facts of the case, but, because his attorney failed to meet with him, these witnesses were never called.  He then, among other things, claimed that one person admitted she opened the door to his house to let his dog outside and asserted that various individuals "did this on purpose to make [him] look bad."  He also claimed that someone had trained his dog to attack because "[t]here is someone trying to get rid of me or kill me"; "[t]hey want my house really bad."  Defendant's counsel, who spoke next,

5

acknowledged he did not spend much time with defendant. But he said that was because defendant "want[ed] [him] to pursue defenses that [we]re not pursuable, that [we]re not based in reality." He added: "I can't track down phantom witnesses or pursue conspiracy theories or things like that." After hearing from both defendant and his attorney, the court denied defendant's request to relieve his counsel. It reasoned that it "d[id] not find that there [wa]s a breakdown in the relationship between Mr. Lindstrom and [his counsel]," and that Lindstrom's counsel "ha[d] more than competently and professionally represented Mr. Lindstrom." After the so-called "Marsden" hearing, the court allowed defendant another week to obtain a second medical opinion.

A week later, on December 7, 2018, defendant came, according to his counsel, "basically empty handed." Defendant had met with a registered nurse and obtained pills of some sort to treat his condition, but he had been unable to meet with another psychiatrist. According to defendant, his healthcare provider said it would take "between two weeks and two months to get assigned a new physician," and so, instead of scheduling an appointment with a new psychiatrist, he scheduled a second appointment with his initial psychiatrist for January 2019. Defendant added that, although he had obtained prescription pills, he had accidentally left them at the hospital.

The court afterward asked counsel for their recommendations and both recommended moving forward with sentencing. The prosecutor expressed doubt that defendant would ultimately participate in mental health court, and defendant's counsel agreed, saying, "I don't think it's going to work because I don't think he is going to participate and cooperate." The court also agreed and proceeded to sentencing. It sentenced defendant to 364 days in jail, suspended execution of sentence, and placed defendant on formal probation for five years.

DISCUSSION

I

*Denial of Defendant's Request to Relieve His Attorney*

Defendant first contends we should remand for resentencing because the trial court wrongly denied his request to relieve his attorney. We agree.

All criminal defendants have some ability to discharge their counsel. But their right to discharge their counsel varies significantly depending on whether they are seeking to replace retained or appointed counsel. An indigent defendant "seeking to substitute one *appointed* attorney for another," for example, must "demonstrate either that the first appointed attorney is providing inadequate representation [citations], or that he and the attorney are embroiled in irreconcilable conflict [citation]." (*Ortiz*, *supra*, 51 Cal.3d at p. 984.) But a nonindigent defendant seeking to replace *retained* counsel, like defendant, need not make any showing at all. As our Supreme Court has explained, "[t]he right of a nonindigent criminal defendant to discharge his retained attorney, with or without cause, has long been recognized in this state." (*Id.* at p. 983.)

The different treatment of indigent defendants seeking to replace appointed counsel and nonindigent defendants seeking to replace retained counsel is founded largely on different "policy concerns." (*Ortiz*, *supra*, 51 Cal.3d at p. 986.) For example, "it is ordinarily appropriate to require the defendant who is seeking to substitute one appointed counsel for another to show cause, because he is requesting duplicative representation and repetitive investigation at taxpayer expense." (*Ibid.*) But those concerns are not present when a defendant seeks to retain new counsel or requests appointed counsel for the first time. (*Ibid.*) In that circumstance, "[n]o additional public expense or drain on the state's limited resources is at issue, nor, as long as the motion is timely, is there a risk of any undesirable opportunity to 'delay trials and otherwise embarrass effective prosecution' of crime." (*Ibid.*, fn. omitted.)

7

But although nonindigent defendants are typically accorded significant leeway in replacing their counsel, their right to do so "is not absolute." (*Id.* at p. 983.) As our Supreme Court explained in *Ortiz*: "The trial court, in its discretion, may deny such a motion if discharge will result in 'significant prejudice' to the defendant [citation], or if it is not timely, i.e., if it will result in 'disruption of the orderly processes of justice' [citations]." (*Ibid.*) Absent a proper finding of that sort, however, the court may not deny the request and thereby "ignore the value we place on allowing defendants to defend themselves as they deem best." (*Id.* at p. 987.)

In this case, we have a nonindigent defendant who sought to replace his retained counsel. But as all parties acknowledge, the trial court mistakenly proceeded as if he were an indigent defendant seeking to replace his appointed counsel. Before sentencing, again, defendant asserted he was not being "well represented" and asked whether he could "fire [his] attorney and get a new attorney." But the court found he could not. Mistakenly applying the standard applicable for indigent defendants seeking to replace their appointed counsel, it reasoned that defendant's attorney had "competently and professionally represented Mr. Lindstrom" and "there [wa]s [no] breakdown in the relationship between Mr. Lindstrom and [his attorney]." A week later, the court sentenced defendant.

Under similar circumstances, courts have found a trial court's denial of a defendant's motion to relieve retained counsel mandated automatic reversal. In *Ortiz*, for example, the defendant sought to replace his retained counsel four months after a mistrial on a murder charge and "well before any second trial." (*Ortiz*, *supra*, 51 Cal.3d at pp. 979-980, 987.) But the trial court denied the request "on the ground that defendant had not demonstrated his attorneys' incompetence." Several months after, the court found the defendant guilty of second degree murder following "a '*Bunnell* plea.' " (*Id.* at pp. 980-981.) The Supreme Court later found reversible error.

8

Although, the court explained, "we do require an *indigent* criminal defendant who is seeking to substitute one *appointed* attorney for another to demonstrate either that the first appointed attorney is providing inadequate representation [citations], or that he and the attorney are embroiled in irreconcilable conflict [citation], we have never required a *nonindigent* criminal defendant to make such a showing in order to discharge his *retained* counsel." (*Ortiz*, *supra*, 51 Cal.3d at p. 984.) And although, the court added, "[a] nonindigent defendant's right to discharge his retained counsel . . . is not absolute," it is subject to few limitations. In particular, the court stated, "[t]he trial court, in its discretion, may deny such a motion [only] if discharge will result in 'significant prejudice' to the defendant [citation], or if it is not timely, i.e., if it will result in 'disruption of the orderly processes of justice' [citation]." (*Id.* at p. 983.) "Applying the law to the facts of this case," the court found "that the trial court erred by requiring [the] defendant to demonstrate the incompetence of [his retained counsel] before allowing him to discharge them. Defendant's motion, made after the mistrial and well before any second trial, was sufficiently timely; the timing reflects defendant's genuine concern about the adequacy of his defense rather than any intent to delay the retrial. On this showing," the court held, "discharge of the [defense counsel] would not have interfered with the 'orderly processes of justice.' " (*Id.* at p. 987.)

The Court of Appeal in *People v. Munoz* (2006) 138 Cal.App.4th 860 (*Munoz*) found similarly on facts more like our own. The defendant there sought to replace his retained counsel "40 days after he was convicted and 9 before he was scheduled to be sentenced." (*Id.* at p. 864.) But the trial court, mistakenly applying the standard applicable for indigent defendants, denied the request and later sentenced the defendant. (*Id.* at pp. 865-866.) On appeal, the Court of Appeal reversed. Although the court acknowledged that a request for new counsel after trial would often involve excessive delay and public expense (*id.* at p. 868), and although the court accepted that the trial

9

court in this case may have, had it applied the correct standard, been able to properly deny the defendant's request (*id.* at p. 869), it found the record before it required reversal.

To start, the court explained, "there [wa]s nothing in the record to suggest" that the trial court "inquir[ed]" into whether granting the defendant's request would cause "substantial delay in the administration of justice." (*Munoz*, *supra*, 138 Cal.App.4th at pp. 869-870.) And to the extent, the court went on, the trial court assumed that substantial delay would occur without due consideration of the defendant's interest in new counsel, that was improper. A trial court, the court explained, " 'must balance the defendant's interest in new counsel against the disruption, if any, flowing from the substitution' [citation]"; it cannot " 'myopic[ally] insist[] upon expeditiousness in the face of a justifiable request for delay. . . .' [Citation.]" (*Id.* at p. 870.) Turning to the circumstances of the defendant's request, the court doubted that granting the request would have led to an unreasonable delay. Among other things, the court noted that there was no evidence that the defendant "had an interest in delay," the case was "not particularly complicated," the trial was short ("last[ing] but two days"), and "it is unlikely that preparing the record for review by a new attorney would have taken an inordinate amount of time." (*Ibid.*) On these facts, the court found "the trial court violated defendant's Sixth Amendment right to effective assistance of counsel by denying his motion to relieve retained counsel." (*Ibid.*)

We reach a similar conclusion here. Again, as our Supreme Court explained in *Ortiz*, a trial court may deny a defendant's request to discharge retained counsel only "if discharge will result in 'significant prejudice' to the defendant [citation], or if it is not timely, i.e., if it will result in 'disruption of the orderly processes of justice' [citations]." (*Ortiz*, *supra*, 51 Cal.3d at p. 983.) But, in this case, the trial court neither explicitly nor implicitly found either of these two considerations present before denying defendant's request. It never suggested that granting defendant's request would " 'significant[ly] prejudice" defendant. Nor did it suggest that granting his request would "result in

10

'disruption of the orderly processes of justice.' " It never, it appears, considered these issues at all. And although it is true, as the Attorney General points out, that the court at least expressed some concern with delay related to defendant's obtaining a medical treatment plan, the court never expressed any similar concern related to defendant's request to replace his counsel.

Nor, considering the facts of this case, is it evident that granting defendant's request would have caused any delay, let alone an "unreasonable delay in the processes of justice." (*Ortiz, supra*, 51 Cal.3d at p. 987.) After denying defendant's request, notably, the court granted a continuance of a week to obtain a second medical opinion and treatment plan. Nothing in the record suggests that defendant would have been unable to retain new counsel in that period. Nor does anything in the record suggest that new counsel, once retained, would have been unable to sufficiently prepare in this timeframe. The presentation of evidence and argument for defendant's trial, after all, covered only two days and about 250 pages of transcript. Considering these facts, "it seems unlikely that [defendant's hiring of new counsel] would have led to 'an unreasonable disruption of the orderly process of justice,' " if any disruption at all. (*Munoz, supra*, 138 Cal.App.4th at p. 870.) And although "[t]here may have been other circumstances supporting a finding of unreasonable delay, . . . they are not apparent from the record, and we cannot speculate about them in order to affirm the ruling." (*People v. Lopez* (2018) 22 Cal.App.5th 40, 50.)

Apart from an absence of evidence supporting a finding of unreasonable delay, we also find nothing in the record suggesting that defendant sought to replace his attorney for any improper purpose. If anything, the record suggests the contrary. Defendant asserted that he "wanted to meet with [his counsel] to discuss" his case before trial, but, because his counsel said he was "too busy or overworked or whatever," they "never met." He added that he "wanted to call people forward that would lend some information on [his] character and on . . . the situation itself," but, because he was never able to "meet with

11

[his] attorney and talk with him and openly discuss [the facts of the case] . . . [and] develop or devise a strategy of defense," these witnesses were never called. Defendant, in short, appeared to have had a legitimate belief that his counsel was not listening to him and not adequately representing his interest. And although his belief may have been partially founded on, according to his attorney, an interest in pursuing defenses "that [we]re not based in reality," that alone was not ground for denying defendant's request. The trial court, after all, could not deny defendant's request to discharge his attorney merely because it found the request unwise or poorly reasoned, unless it found the "discharge w[ould] result in 'significant prejudice' to the defendant" or "w[ould] result in 'disruption of the orderly processes of justice.' " (*Ortiz*, *supra*, 51 Cal.3d at p. 983; see also *ibid.* [a nonindigent criminal defendant may "discharge his retained attorney[] with or without cause"].) But again, the court never appeared to find either circumstance true.

On these facts, we find the trial court abused its discretion when it denied defendant's request to relieve his retained counsel. (*Munoz*, *supra*, 138 Cal.App.4th at p. 870.) We further find that this violation "mandates automatic reversal." (*Ibid.*; see also *Ortiz*, *supra*, 51 Cal.3d at p. 988 ["Reversal is automatic . . . when a defendant has been deprived of his right to defend with counsel of his choice."]; *United States v. Gonzalez-Lopez* (2006) 548 U.S. 140, 144, 147-148 [165 L.Ed.2d 409] [the "right to select counsel of one's choice," although " 'circumscribed in several important respects,' " is protected under the Sixth Amendment]; *id.* at p. 150 ["erroneous deprivation of the right to counsel of choice, 'with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as "structural error" ' " that requires automatic reversal].)

Seeking a contrary conclusion, the Attorney General offers several cases he finds more relevant to our facts, including *People v. Keshishian* (2008) 162 Cal.App.4th 425, *People v. Lau* (1986) 177 Cal.App.3d 473, and *People v. Dowdell* (2014) 227 Cal.App.4th 1388 (*Dowdell*). But all these cases are readily distinguishable. In *Keshishian*, *supra*, 162 Cal.App.4th 425, the defendant sought to discharge his counsel

"on the day set for trial after the case had been pending for two and a half years." (*Id.* at p. 429.) Importantly, in finding the "trial court did not err in denying the request," the court noted that "[t]he [trial] court here applied the *correct* standard in rejecting appellant's last-minute attempt to discharge counsel and delay the start of trial." (*Ibid.*, italics added.) Similarly, in *Lau*, *supra*, 177 Cal.App.3d 473, the defendant sought to discharge his counsel "the moment jury selection was to begin." (*Id.* at p. 479.) In "find[ing] no error in the court's consideration and denial of [the defendant's] request," the court, similar to the *Keshishian* court, indicated that the trial court applied the correct standard in denying the request. (*Ibid.*; *id.* at p. 477, fn. 3.) Finally, in *Dowdell*, *supra*, 227 Cal.App.4th 1388, the defendant sought to remove her counsel on the eighth day of trial in a case involving "complex legal issues, numerous witnesses and exhibits, and hours of recorded audio." (*Id.* at pp. 1411-1412.) Although, in this case, the court found the trial court relied on the wrong standard in considering the defendant's request, it nonetheless concluded that "[t]he court implicitly found that granting [the defendant] a continuance long enough to retain new counsel could cause an unreasonable 'disruption of the orderly processes of justice' from the loss of too many jurors." (*Id.* at p. 1412.)

But of all these cases, only one involved a trial court that mistakenly applied the wrong standard when evaluating a defendant's request to relieve retained counsel. And the facts of that one case, *Dowdell*, are in no way comparable to our own. Granting the defendant's request there, which came in the middle of a complicated trial, would have resulted in "the loss of too many jurors" and required a new attorney to spend "substantial time to prepare." (*Dowdell*, *supra*, 227 Cal.App.4th at p. 1412.) But nothing on our facts suggests a similar " 'disruption of the orderly processes of justice.' " (*Ortiz*, *supra*, 51 Cal.3d at p. 983.) Nothing on our facts, for example, indicates that granting defendant's request would have required a redo of anything, let alone a complicated trial. Nor do our facts support a finding that a new attorney would have needed to spend substantial time to come up to speed. Again, this is not a complicated case. It is a simple

13

case that involved a brief trial.  And given these features of the case, we find it highly "unlikely that appointing new counsel for defendant would have led to 'an unreasonable disruption of the orderly processes of justice.' [Citation.]" (*Munoz, supra*, 138 Cal.App.4th at p. 870.)

II

*Defendant's Counsel's Failure to Request Pretrial Mental Health Diversion*

Defendant next contends his counsel was ineffective because he failed to request mental health diversion under section 1001.36.  Because, however, we find that defendant may still seek diversion under this statute on remand, we need not address the merits of his argument here.

Section 1001.36, which became effective a little over two months before defendant's trial, "authorizes a pretrial diversion program for defendants with qualifying mental disorders." (*People v. Frahs* (2020) 9 Cal.5th 618, 623, 626 (*Frahs*).)  It defines "pretrial diversion" to "mean[] the postponement of prosecution, either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged until adjudication, to allow the defendant to undergo mental health treatment . . ." (§ 1001.36, subd. (c).)

Although the statute does not define the phrase "until adjudication," case law offers three potential interpretations.  Under the first, the time of adjudication is the time that guilt is found. (*People v. Graham* (2021) 64 Cal.App.5th 827, 832-833 (*Graham*) ["a request for 'pretrial diversion' under section 1001.36 is timely only if it is made prior to the jury's guilty verdict"], review granted Sept. 1, 2021, S269509; *People v. Craine* (2019) 35 Cal.App.5th 744, 755 [the term "adjudication" in § 1001.36 is "shorthand for the adjudication of guilt or acquittal"], review granted Sept. 11, 2019, S256671, disapproved of on other grounds by *Frahs, supra*, 9 Cal.5th 618.)  Under the second, the time of adjudication is the time a jury is impaneled and sworn. (*People v. Braden* (2021) 63 Cal.App.5th 330, 333 (*Braden*) ["a defendant is ineligible for diversion under section

14

1001.36 after his trial begins"], review granted July 14, 2021, S268925; *People v. Torres* (2019) 39 Cal.App.5th 849, 855 [" 'Until adjudication' means before the jury is impaneled and sworn."], disapproved of on other grounds by *Frahs*.) And under the third, the time of adjudication is the time of sentencing. (*People v. Curry* (2021) 62 Cal.App.5th 314, 320 (*Curry*) ["section 1001.36 contemplates mental health diversion until entry of the judgment of conviction"], review granted July 14, 2021, S267394; *Craine*, at p. 755 ["At most, 'adjudication' could be synonymous with the rendition or pronouncement of judgment, which occurs at the time of sentencing."].)

The distinction between these three interpretations is important, for if a case is "adjudicat[ed]" only once the sentence is rendered, then we would have no need to consider defendant's contention here. In that event, because our finding in part I of our Discussion requires the vacatur of defendant's sentence, defendant would be able to pursue diversion under section 1001.36 on remand and his claim of ineffective assistance of counsel would be moot. But if, on the other hand, a case is "adjudicat[ed]" once guilt is established (or even earlier, at the time a jury is impaneled and sworn), then he would not. Our finding in part I, after all, does not set aside the court's finding of guilt, which occurred before defendant sought to replace his counsel. And so, were the term "adjudication" to be construed in this latter manner, then defendant would be unable to pursue diversion under section 1001.36 on remand.

Considering the ordinary meaning of the term "adjudication," the structure of the mental health diversion law, and the stated purposes of the law, we construe the phrase "from the point at which the accused is charged until adjudication" to mean "the point at which the accused is charged until" judgment—which is to say, until the time that the court orally pronounces sentence. Because of this conclusion, we find that defendant's claim of ineffective assistance of counsel is moot.

We begin our analysis with the term "adjudication." As discussed, it is a term with several potential meanings. According to Black's Law Dictionary, for example, it

15

has two meanings:  (1) "[t]he legal process of resolving a dispute," and (2) "judgment," which is itself defined to mean "[a] court's final determination of the rights and obligations of the parties in a case."  (Black's Law Dict. (11th ed. 2019).)  According to some other dictionaries, on the other hand, the term's meaning is a bit broader.  The Random House Dictionary of the English Language, for example, defines the term to mean, with respect to the law, either "the act of a court in making an order, judgment, or decree," "a judicial decision or sentence," or "a court decree in bankruptcy."  (Random House Dictionary of the English Language (2d ed. 1987) p. 25, col. 2.)  Several other dictionaries offer similar definitions.  (See Webster's New Collegiate Diet. (9th ed. 1988) p. 56, col. 1 [adjudication means, among other things, "a judicial decision or sentence"]; see also *Braden*, *supra*, 63 Cal.App.5th at p. 337 [stating that, in Merriam-Webster's online dictionary, the "first definition of 'adjudication' is 'the act or process of adjudicating a dispute' "].)  Putting these several definitions together, we are left with three general meanings for the term "adjudication":  the legal process of resolving a dispute, a judicial decision other than a judgment, and a judgment.

But of these several potential definitions, we find only one—the term defined as "judgment"—is reasonable in the context of section 1001.36.  Consider first the definition of adjudication as the "legal process of resolving a dispute."  (Black's Law Dict. (11th ed. 2019).)  Assuming this definition of "adjudication" applied here, we would have to read section 1001.36 to say that a defendant may seek diversion "at any point in the judicial process from the point at which the accused is charged until" the "legal process of resolving a dispute."  But that sentence makes no sense.  The term "adjudication" in section 1001.36, after all, refers to a "point in the judicial process," and the "legal process of resolving a dispute" is plainly not a "point in the judicial process."

Consider next the definition of adjudication as a judicial decision other than a judgment.  (See Random House Dictionary of the English Language (2d ed. 1987) p. 25, col. 2; Webster's New Collegiate Diet. (9th ed. 1988) p. 56, col. 1.)  Courts most often

16

employ this understanding of the term when referring to the "adjudication of guilt." In *In re Harris* (1989) 49 Cal.3d 131 (*Harris*), for example, our Supreme Court discussed the scope of a proceeding "from filing to adjudication of guilt"—meaning, from the filing of charges to the finding or plea of guilt. (*Id.* at p. 136.) In other cases, the court has on occasion similarly discussed the "judgment of guilt" or "judgment about guilt" when referring to the jury's finding of guilt. (*People v. Montiel* (1993) 5 Cal.4th 877, 912 (*Montiel*) [discussing a jury's "judgment of guilt"], disapproved of on other grounds by *People v. Sanchez* (2016) 63 Cal.4th 665, 686 fn. 13; *People v. Souza* (2012) 54 Cal.4th 90, 109 [discussing a jury's " ' "judgment about guilt" ' "].) And the Legislature too has occasionally used similar language, at times referring to the "adjudication of guilt" and "adjudication by a trier of fact." (Veh. Code, § 15210, subd. (d) ["adjudication of guilt"]; § 299, subd. (c)(1) ["adjudication by a trier of fact"].)

But when the terms adjudication and judgment are used to refer to the finding of guilt, that is typically clear from context. The court in *Harris*, for example, did not refer to the scope of a proceeding "from filing to adjudication"; it referred to the scope of a proceeding "from filing to adjudication of guilt." (*Harris, supra,* 49 Cal.3d at p. 136.) And the court in *Montiel*, in like fashion, did not refer simply to the guilty verdict as the "judgment"; it instead referred to the jury's "judgment of guilt." (*Montiel, supra,* 5 Cal.4th at p. 912.) That in mind, had the Legislature intended in section 1001.36 to refer to the time that guilt is established, we would have expected it to use the phrase "until adjudication of guilt," or at least provided some other indication of this intent, rather than simply use the phrase "until adjudication."

We are left, then, with the final definition of adjudication—adjudication as "judgment." And considering the term in this fashion, without any qualifying reference to guilt, we understand the time of "adjudication" in section 1001.36 to mean the time "when the trial court orally pronounces sentence." (See *People v. Karaman* (1992)

17

4 Cal.4th 335, 344 ["In a criminal case, judgment is rendered when the trial court orally pronounces sentence."].)

Several considerations, some of which we have already touched on, guide us in reaching this conclusion. First, we find this construction best accords with the Legislature's unqualified use of the word "adjudication" in section 1001.36. The Legislature, importantly, did not refer to the "adjudication of guilt." Nor did it refer to the adjudication of some particular issue. It instead referred simply to the point of "adjudication" in the "judicial process." Considering this context, and seeing no indication of a contrary intent, we understand this language to refer to the time of judgment rather than the time of some other, earlier judicial decision in the judicial process. (Compare *Harris*, *supra*, 49 Cal.3d at p. 136 [referring to the "adjudication of guilt"] with *Beeler v. American Trust Co.* (1946) 28 Cal.2d 435, 437 [using the terms "judgment" and "adjudication" interchangeably; discussing the "judgment" and "the date of entry of such adjudication"].)

Second, we find this construction is consistent with the Legislature's broad statement of purpose in section 1001.35, which, as our Supreme Court has explained, evinces the Legislature's intent that " 'the mental health diversion program . . . apply as broadly as possible.' [Citation.]" (*Frahs*, *supra*, 9 Cal.5th at p. 632; see also § 1001.35, subd. (a) [the mental health diversion program serves, among other things, to "[i]ncrease[] diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety"]; *Curry*, *supra*, 62 Cal.App.5th at p. 324 [the Legislature's stated intent in § 1001.35 favors "the conclusion we should interpret the phrase 'until adjudication' to mean 'until the judgment of conviction' (of which sentencing is a necessary component) rather than 'until adjudication of guilt' "].)

Finally, to the extent any ambiguity remains on the meaning of the term "adjudication," we find our construction of that term is favored under the rule of lenity.

18

(See *Smith v. LoanMe, Inc.* (2021) 11 Cal.5th 183, 202 [when " ' "two reasonable interpretations of the same [criminal] provision stand in relative equipoise," ' " the rule of lenity requires the ambiguity to " ' " 'be resolved in favor of lenity, giving the defendant the benefit of every reasonable doubt on questions of interpretation' " ' "]; *Walsh v. Department of Alcoholic Beverage Control* (1963) 59 Cal.2d 757, 764-765 ["it is 'the policy of California [citation] to construe and apply penal statutes as favorably to the defendant as the language of the statute and the circumstances of its application may reasonably permit' [citation]"].)

In reaching this conclusion, we stand by our recent decision in *Curry*, *supra*, 62 Cal.App.5th 314. (*Id.* at p. 323 ["the phrase 'until adjudication' should be interpreted to mean 'until the judgment of conviction'—which does not occur until sentencing"].) But we acknowledge that two published decisions since *Curry* have rejected our reasoning. (See *Braden*, *supra*, 63 Cal.App.5th at p. 333; *Graham*, *supra*, 64 Cal.App.5th at p. 829, review granted.) We briefly address those two decisions here, starting with *Braden*.

The court there expressly "disagreed with *People v. Curry* (2021) 62 Cal.App.5th 314," concluding that "a defendant is ineligible for diversion under section 1001.36 after his trial begins." (*Braden*, *supra*, 63 Cal.App.5th at p. 333.) Its reasoning was fourfold. First, the court based its conclusion on the fact "that the Legislature five times in the text of section 1001.36 referred to the mental health diversion program as 'pretrial' diversion. [Citation.] Regardless of the precise moment that defines the beginning of trial, a case is no longer 'pretrial' once a trial has started." (*Ibid.*) But "pretrial diversion," again, is a defined term that "means the postponement of prosecution, either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged until adjudication." (§ 1001.36, subd. (c).) That definition in mind, although we would generally agree that a case is no longer "pretrial" once a trial has started, we cannot agree that a case has been prosecuted to "adjudication" before a trial has even begun. Our conclusion in this regard, we acknowledge, highlights the tension between

19

the terms "pretrial" and "adjudication." But "[w]hen 'a statute includes an explicit definition' of a term, 'we must follow that definition, even if it varies from a term's ordinary meaning.' [Citation.]" (*Van Buren v. United States* (2021) ___ U.S. ___ [141 S.Ct. 1648, 1657, 210 L.Ed.2d 26, 37-39].)

Second, the *Braden* court based its conclusion on our Supreme Court's decision in *Morse v. Municipal Court* (1974) 13 Cal.3d 149 (*Morse*). In *Morse*, the court considered the latest point in time that a defendant could seek pretrial diversion under section 1000 et seq.—a statutory scheme that allows pretrial diversion for certain drug crimes. (*Morse,* at p. 153.) In addressing this question, the court found determinative a statute in that scheme, section 1000.1, that makes a defendant's participation in the diversion program contingent on the defendant waiving his or her right to a speedy trial, which is a right that a defendant may only assert before the commencement of trial. Based on this requirement, the court concluded that "the plain meaning of the waiver of speedy trial language of section 1000.1 is that the defendant's consent to referral of his case to the probation department should be tendered to the district attorney prior to the commencement of trial." (*Morse,* at p. 156.)

Considering this holding, along with section 1001.36's similar requirement that a defendant must waive his or her right to a speedy trial to participate in mental health diversion, the *Braden* court concluded that *Morse* "requir[es] us to construe section 1001.36 as precluding requests for mental health diversion after trial begins." (*Braden*, *supra*, 63 Cal.App.5th at p. 335.) We find differently. Section 1000 et seq., the statutory scheme covered in *Morse*, is not altogether comparable to section 1001.36. Most importantly here, although both statutes require defendants to waive their speedy trial rights before participating in a diversion program, and although both refer to pretrial diversion, only section 1001.36 defines the phrase "pretrial diversion" to allow diversion until the time of "adjudication"—which, again, is a time that we hold occurs *after* trial has begun. This broad definition of "pretrial diversion" may leave the requirement that a

20

defendant waive his or her right to a speedy trial inapplicable at times, but that alone is not, in our view, a reason to write the phrase "until adjudication" out of the definition of "pretrial diversion."

Third, the *Braden* court stated, "construing section 1001.36 as requiring that a diversion request be made before trial is consistent with the nature of California diversion programs, which long have had a purpose of reducing the systemic burdens of criminal trials." (*Braden*, *supra*, 63 Cal.App.5th at p. 335.)  But although true that pretrial diversion programs can serve to avoid the necessity of trial, and although true that this result may be beneficial, this is not among the stated purposes of the diversion program before us.  According to section 1001.35, this program has three purposes:  "(a) Increased diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety.  [¶]  (b) Allowing local discretion and flexibility for counties in the development and implementation of diversion for individuals with mental disorders across a continuum of care settings.  [¶] (c) Providing diversion that meets the unique mental health treatment and support needs of individuals with mental disorders."  These purposes, as we explained in *Curry*, demonstrate "[a] legislative intent that the mental health diversion program apply as broadly as possible" (*Curry*, *supra*, 62 Cal.App.5th at p. 324)—not simply an intent that the diversion program apply narrowly to minimize the number of trials.

We find that true even though, as the *Braden* court noted, three older cases have stated that pretrial diversion programs serve to avoid the necessity of trial.  (*Braden*, *supra*, 63 Cal.App.5th at pp. 335-336.)  Two of these three cases, importantly, concerned section 1000 et seq.  (*People v. Alonzo* (1989) 210 Cal.App.3d 466, 467; *People v. Hudson* (1983) 149 Cal.App.3d 661, 663.)  But, again, that statutory scheme does not include an expansive definition of the term "pretrial diversion," and so we decline to find these cases helpful to our analysis.

21

The *Braden* court's third cited case, *Gresher v. Anderson* (2005) 127 Cal.App.4th 88, is more complicated. That case concerned section 1001 et seq., a statutory scheme that provides a diversion program similar to that here and that offers an identical definition of "pretrial diversion." (§ 1001.1 [defining "pretrial diversion"].) The *Gresher* court considered in particular whether a statute—which allows the State Department of Social Services to cease processing certain types of applications when the applicant "is awaiting trial for a crime other than a minor traffic violation"—applies when the applicant is in "pretrial diversion" under section 1001.1. (*Gresher,* at pp. 110-111.) The court found it did not. It reasoned that "a trial is not contemplated" for persons who pursue pretrial diversion under section 1001.1, and so, unless they are removed from their diversion program for cause, "it cannot reasonably be said that persons in diversion programs are 'awaiting trial.' " (*Gresher,* at p. 111.) The court added that "[t]he purpose of [all diversion and deferred entry of judgment] programs is precisely to *avoid* the necessity of a trial" (*ibid.*)—which is the point that the *Braden* court focused on in its own analysis (*Braden*, *supra*, 63 Cal.App.5th at p. 335).

We decline, however, to agree with this broad proposition, which the *Gresher* court offered without citation or explanation. Although we generally agree with that court's bottom line—a "trial is not contemplated" (or perhaps better to say, no future trial is contemplated) for persons who pursue pretrial diversion under section 1001.1—we cannot agree that the purpose of all diversion programs is to avoid the necessity of a trial. Several diversion programs, after all, allow a defendant to pursue diversion until the time of "adjudication." (See §§ 1001.1, 1001.36, 1001.50, 1001.70, 1001.80.) And, again, we cannot say that a case could be prosecuted to "adjudication" before the determination of guilt and even before the start of trial.

Fourth, the *Braden* court construed the term "adjudication" to "refer[] to the *process* of adjudicating an issue," explaining that, when a word in a definition is susceptible of more than one reading, courts should adopt the one that best matches the

ordinary meaning of the defined term—which, in this case, is "pretrial diversion." (*Braden*, *supra*, 63 Cal.App.5th at pp. 336-337.) We agree, as mentioned, that the term "adjudication" could be interpreted in this manner in some contexts. (See Black's Law Dict. (11th ed. 2019) [the term "adjudication" means, among other things, the "legal process of resolving a dispute"].) We agree too that, as the *Braden* court noted, "[i]n settling on a fair reading of a statute, it is not unusual to consider the ordinary meaning of a defined term, particularly when there is dissonance between that ordinary meaning and the reach of the definition." (*Bond v. United States* (2014) 572 U.S. 844, 861 [189 L.Ed.2d 1, 15].) But those considerations are not, in our view, enough to adopt the *Braden* court's construction of the term "adjudication." To start, although it is certainly not unusual to consider the ordinary meaning of a defined term like "pretrial diversion," "[w]hen 'a statute includes an explicit definition' of a term, 'we must follow that definition, even if it varies from a term's ordinary meaning.' [Citation.]" (*Van Buren*, *supra*, ___ U.S. at p. ___ [141 S.Ct. at p. 1657, 210 L.Ed at pp. 37-39].) Moreover, although "adjudication" could be construed as the process of adjudicating an issue in some instances, applying that construction here, as discussed, would leave a nonsensical definition of "pretrial diversion." Again, the term "adjudication" in section 1001.36 refers to a "point in the judicial process," and the "process of adjudicating an issue" is certainly not a "point in the judicial process."

We turn next to the court's decision in *Graham*, *supra*, 64 Cal.App.5th 827, review granted, which also rejected our decision in *Curry*, though on somewhat different grounds. While declining to "go as far as" the *Braden* court, it "h[e]ld that a request for 'pretrial diversion' under section 1001.36 is timely only if it is made prior to the jury's guilty verdict." (*Graham*, at pp. 829, 832-833.) In support, the court first stated that "the phrase 'pretrial diversion' by itself strongly suggests a timing requirement." (*Id.* at p. 833.) But although we agree that section 1001.36 sets a timing requirement, we find that this requirement resides in the definition of "pretrial diversion," not in the word "pretrial"

23

alone. Even the *Graham* court appeared to agree on this point, for had it allowed itself to be guided by the word "pretrial" alone, then it would have concluded that "pretrial" diversion may occur only pretrial—a conclusion that it itself declined to adopt. (*Graham*, at p. 829.)

Second, turning to the definition of "pretrial diversion," the court stated that the term " 'adjudication' typically refers to an adjudication of guilt." (*Graham*, *supra*, 64 Cal.App.5th at p. 833, review granted.) In support, the court cited our Supreme Court's decision in *Harris*, which, as covered already, referred to the "adjudication of guilt." (*Harris*, *supra*, 49 Cal.3d at p. 136.) But we find *Harris* to be poor support for this proposition for several reasons. First, in our view at least, the term "adjudication" does not typically refer to the adjudication of guilt. Considering Black's Law Dictionary, for example, the term "adjudication" does not refer to the "adjudication of guilt" at all; it refers instead either to (1) "[t]he legal process of resolving a dispute" or (2) "judgment," which is itself defined to mean "[a] court's final determination of the rights and obligations of the parties in a case." (Black's Law Dict. (11th ed. 2019).) Second, although the court in *Harris* used the phrase "adjudication of guilt," our Supreme Court in other cases has used the word "adjudication" to mean judgment. (See *French v. Rishell* (1953) 40 Cal.2d 477, 479 [using the phrase "final judgment" and "final adjudication" interchangeably]; *Beeler v. American Trust Co.*, *supra*, 28 Cal.2d at p. 437 [using the terms "judgment" and "adjudication" interchangeably]; *Seligman v. Kalkman* (1860) 17 Cal. 152, 156, 159 [" 'adjudication' and 'judgment' are synonymous" when the term "judgment" means " 'the final determination of the rights of the parties in the action or proceeding' "].) And lastly, the California Supreme Court has also at times used the phrase "judgment of guilt" or "judgment about guilt" when referring to a jury's verdict (*Montiel, supra,* 5 Cal.4th at p. 912; *People v. Souza, supra,* 54 Cal.4th at p. 109), yet no one, we expect, would assert that the term "judgment" typically refers to a jury's verdict

24

(see *People v. McKenzie* (2020) 9 Cal.5th 40, 46 ["In criminal actions, the terms 'judgment' and ' "sentence" ' are generally considered 'synonymous.' "]).

Third, the *Graham* court found that the stated purposes of the mental health diversion program "are fully served by allowing defendants to seek mental health pretrial diversion prior to adjudication of their guilt." (*Graham*, *supra*, 64 Cal.App.5th at p. 833, review granted.) But one of these stated purposes, again, is "[i]ncreased diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety." (§ 1001.35, subd. (a).) Although this purpose is certainly served in part in allowing mental health diversion before the finding of guilt, it is more "fully served" by allowing diversion until the time of sentencing.

Finally, the *Graham* court expressed concern about "the inefficient use of finite judicial resources" were section 1001.36 to be construed more broadly. In particular, the court noted: "If a defendant knows that pretrial diversion is available even after going to trial, why not see what happens at trial and then, if the jury returns a guilty verdict, seek pretrial diversion? Does a defendant receive ineffective assistance of counsel if her lawyer does *not* take this approach?" (*Graham*, *supra*, 64 Cal.App.5th at pp. 833-834, review granted.) But although we acknowledge that our construction of section 1001.36 would, relative to the *Graham* court's construction, result in more defendants pursuing trial before attempting to pursue mental health diversion, we decline to find that this consideration alone requires a narrow interpretation of the term "adjudication." The Legislature, after all, may have thought it better to maximize the number of individuals who participate in mental health diversion programs than to minimize the number of individuals who pursue trial. Construing the statute in this manner, to be sure, may demand more judicial resources. But it could very well result in more efficient use of resources overall. Indeed, according to an analysis of a bill that "amended section 1001.36 just a few months after it was enacted, community-based treatment for a

25

mentally ill individual costs much *less* than jailing the same individual, and greatly reduces recidivism.  (Sen. Rules Com., Off. Of Sen. Floor Analysis, Unfinished Business Analysis of Sen. Bill 215 (2017-2018 Reg. Sess.) as amended Aug. 23, 2018, p. 2 [community-based treatment for a mentally ill defendant costs roughly $20,000 per year; jailing the same defendant costs more than $75,000].)"  (*Frahs*, *supra*, 9 Cal.5th at p. 635.)

In short, because we find a defendant may seek pretrial diversion if he or she chooses to do so any time prior to sentencing, we conclude that defendant's claim here of ineffective assistance of counsel is moot.

III

*Defendant's Remaining Contentions*

We briefly address defendant's three remaining contentions, all of which we find unnecessary to address in light of our conclusion in part I of our Discussion.

First, raising another argument for ineffective assistance of counsel, defendant contends his counsel was ineffective because he advocated against him, rather than for him, during sentencing.  Defendant notes in support, among other things, that he indicated to the trial court that he desired more time to obtain an appointment with a new psychiatrist, but rather than ask for a continuance, his counsel argued:  "I don't think it's going to work because I don't think he is going to participate and cooperate."  Second, defendant contends one of the terms of probation (namely, the prohibition on his having an animal for 10 years) was improper because it exceeded the five-year term of probation.  And finally, in a supplemental brief, defendant contends he should be discharged from probation because a recent amendment to section 1203.1 reduced felony probation to two years.  But because our conclusion in part I of our Discussion requires the vacatur of defendant's sentence, we find all these issues moot.

26

DISPOSITION

Defendant's sentence is vacated, and the matter is remanded to allow defendant to obtain counsel of his choice. After defendant has an opportunity to do so, the trial court must then proceed from the point that defendant originally sought to discharge his attorney.

/s/
BLEASE, Acting P. J.

We concur:

/s/
MAURO, J.

/s/
DUARTE, J.

27